IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| LAYCEE RENE MONEYHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:12CV1174 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, DISTRICT JUDGE.

Plaintiff Laycee Rene Moneyham ("Ms. Moneyham") commenced this action on October 31, 2012 to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Supplemental Social Security benefits. (Doc. 2.) Before the Court are Ms. Moneyham's Motion for Judgment Reversing or Modifying the Decision of the Commissioner and the Commissioner's Motion for Judgment on the Pleadings. (Docs. 8, 10.) The Court heard oral arguments on the parties' motions on March 17, 2015. For the reasons set forth below, the Court denies Ms. Moneyham's Motion and grants the Commissioner's Motion. The decision of the Commissioner is affirmed.

**I. Procedural History**

On August 13, 2009, Ms. Moneyham filed an application for supplemental security benefits, alleging a disability onset of June 15, 2008. (Tr. at 144-46.[1]) Following a denial initially and upon reconsideration by the Social Security Administration ("SSA"), on May 6, 2010, Ms. Moneyham requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 108-10.) The hearing occurred on March 25, 2011 (*id.* at 114), and in a decision dated April 14, 2011, the ALJ denied Ms. Moneyham's disability application. (*Id.* at 9, 23.) On June 15, 2011, Ms. Moneyham requested that the Appeals Council review the ALJ's decision (*id.* at 7-8), and on August 28, 2012, her request was denied (*id.* at 1), making the ALJ's decision the final decision of the Commissioner.

**II. Standard of Review**

This Court's review of the Commissioner's denial of benefits is authorized under 42 U.S.C. § 405(g). *Hancock v. Astrue,* 667 F.3d 470, 471 (4th Cir. 2012). The scope of review, however, is extremely limited. *Frady v. Harris*, 646 F.2d 143, 144 (4th Cir. 1981). The role of the reviewing court is not to "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)(second alteration in original). Rather, the court must uphold the Commissioner's factual findings if they are supported by substantial evidence and are free of legal error. *Hancock*, 667 F.3d at 471. Substantial evidence is such "evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). It is considered more than "a scintilla of evidence" but is less "than a preponderance." *Id.* "'Where conflicting evidence

---

[1] The transcript citations refer to the certified administrative record.

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ].'" *Id.* (quoting *Johnson,* 434 F.3d at 653 (alteration in original)).

### III. SSA Five Step Process and the Decision of the ALJ

In evaluating disability claims, the Commissioner uses a five-step process. *Hancock*, 667 F.3d at 472. In sequence, the Commissioner asks "whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to [his or her] past relevant work; and (5) if not, could perform any other work in the national economy." *Id.* The claimant bears the burden of production and proof in steps one through four; the burden shifts to the Commissioner in step five "to produce evidence that other jobs exist in the national economy that the claimant can perform considering [his or her] age, education, and work experience." *Id.* at 472-73. Before going from step three to step four, the Commissioner assesses the claimant's "residual functional capacity" ("RFC"), a determination of what work the claimant is capable of doing. The RFC is used at step four and at step five when the claim is evaluated at those steps. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). If the ALJ finds that the claimant has failed to satisfy any step of the process, the ALJ need not proceed to the next step. *Id.*

Here, the ALJ found that Ms. Moneyham had not engaged in substantial activity since the onset date through the date she was last insured (step one); had the following severe impairments: bipolar disorder; impulse control disorder; learning problems; and borderline intellectual functioning and anti-social behavior (step two); and that Ms. Moneyham's impairments, alone or in combination, did not meet or equal a listed impairment (step three).

3

(Tr. at 14.) The ALJ then determined that Ms. Moneyham had the RFC to perform work at all exertional levels but with the following non-exertional limitations: simple, routine, repetitive tasks in a low social, low stress environment. (*Id.* at 15.) The ALJ found that Ms. Moneyham had no past relevant work (step four), but considering her age, education, work experience, and RFC, a finding of not disabled would be directed by section 204.00 of the Medical Vocational Grid Rules ("Grids") (step five). (*Id.* at 22-23.) Because the ALJ concluded that the non-exertional limitations had little effect on the occupational base for unskilled work at all exertional levels, he found Ms. Moneyham not disabled. (*Id.* at 23.)

## IV. Discussion

### a. The ALJ did not err in finding that Ms. Moneyham's non-exertional limitations did not erode the occupational base for unskilled work.

Ms. Moneyham first takes issue with the ALJ's decision not to obtain vocational testimony. Because she had non-exertional limitations, Ms. Moneyham contends that the ALJ's reliance on the Grids was improper.

At the fifth step of the sequential evaluation, the burden shifts to the Commissioner to show that other work exists in the national economy which the claimant can perform. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). When a claimant has non-exertional impairments or a combination of non-exertional and exertional impairments that prevent him or her from performing a full range of work at a given exertional level, the Commissioner generally cannot rely on the Grids alone. *Aistrop v. Barnhart*, 36 F. App'x 145, 146-47 (4th Cir. 2002). Rather, the Commissioner may need to consult a vocational expert to prove that the claimant can perform specific jobs that exist in the national economy. *Id.* However, a vocational expert need not be consulted if the ALJ determines that the additional limitations have little to no

4

effect on the occupational job base. *See Adkins v. Astrue*, 2011 WL 652508, at *4 (E.D. Va. Feb. 10, 2011) ("[W]here a claimant's non-exertional limitations have a minimal effect on his exertional occupational base, then a finding guided by the Grids is sufficient, and testimony by a [vocational expert] is unnecessary.")

In this case, the ALJ found that Ms. Moneyham's mental and emotional limitations did not erode the occupational base for unskilled work. The basic demands of unskilled work include the ability to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Social Security Ruling ("SSR") 85-15, 1985 WL 56857, at *4. Although a substantial loss in a claimant's ability to meet any of these basic abilities would limit the occupational base for unskilled work, the ALJ found that Ms. Moneyham's non-exertional limitations were consistent with the demands of unskilled work. (Tr. at 15, 23.) Therefore, under these circumstances, the ALJ did not err in consulting the Grids and deciding against obtaining testimony from a vocational expert. *See Jaynes v. Colvin*, No. 1:12-CV-168, 2014 WL 3109243, at *4 (M.D.N.C. July 8, 2014) (limitation to simple, routine, and repetitive tasks ("SRRT") in a low-stress environment with low social interaction did not erode job base for medium work and thus does not prevent an ALJ from relying on the Grids); *Livingston v. Colvin*, No. 3:13-CV-233, 2014 WL 496484, at *6 (W.D.N.C. Feb. 6, 2014) ("Plaintiff argues that the ALJ finding that her RFC for light work was limited to SRRTs prevented the ALJ from relying on the Grids in determining whether work existed in significant numbers in the national economy that she could perform . . . A limitation to SRRTs does not prevent an ALJ from relying on the Grids."); *Scott v. Cohin*, No. 1:12-CV-170, 2013 WL 3927607, at *6

5

(W.D.N.C. July 29, 2013) ("[L]imitation to simple, unskilled, entry level work that allows for less stress work without public contact or significant interaction with others would not significantly erode the occupational base represented by the Grids") (citation and internal quotation marks omitted); *Eason v. Astrue*, No. 2:07-CV-00030-FL, 2008 WL 4108084, at *16(E.D.N.C. Aug. 29, 2008) (finding no error in ALJ's reliance on the Grids where the ALJ found claimant capable of the mental activities required by unskilled work—understanding, remembering and carrying out simple instructions and making simple work-related decisions).

      b.      **The ALJ's Paragraph B Findings are Supported by Substantial Evidence.**

Ms. Moneyham next contends that the ALJ erred in evaluating the Paragraph B criteria at steps two and three. Among other things, Ms. Moneyham points to what she believes are inconsistencies between evidence related to the ALJ's Paragraph B findings and evidence related to the RFC. Ms. Moneyham's argument reflects a misunderstanding of the five-step sequential process.

As stated in the ALJ's decision, "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of a mental impairment at steps 2 and 3. The mental residual functional capacity at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment[.]" (Tr. at 15.) *See* SSR 96-8p ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed

assessment . . . ."); *Hagan v. Colvin*, No. 5:13–CV–01090–DCN, 2014 WL 4063139, at *3 (D.S.C. Aug. 15, 2014).

Here, the ALJ adopted Dr. Parsley's Psychiatric Review Technique Form ("PRTF") in his Paragraph B analysis (Tr. at 14-15), which relates to the severity of Ms. Moneyham's impairments at steps two and three. Dr. Parsley's Mental Residual Functional Capacity Assessment ("MRFC") is a separate evaluation that pertains to Ms. Moneyham's functional capabilities at the RFC stage (*Id.* at 481-83). In other words, the two are different assessments.[2] *See* SSR 96-8p. Further, the ALJ's finding that Ms. Moneyham had mild restrictions in social functioning is not necessarily inconsistent with Dr. Ricketson's assessment because Dr. Ricketson concluded that "it may take at least 3-6 months to help stabilize" Ms. Moneyham, "at which time she may be a candidate for vocational rehabilitation services . . . [She] is functioning at a relatively competitive level with nonverbal materials and these assets need to be pursued, which would also probably contribute to improved self-concept and less frustration."[3] (Tr. at 453-54.) Although Dr. Clifford noted that she had marked difficulty interacting with others, that assessment was based on the sequential

---

[2] This argument also fails because the section of the MRFC that Ms. Moneyham references ("Summary Conclusions" within Section 1) is not the ALJ's RFC. The RFC is in Section 3. (*See* 481-83); *see also* SSA's Program Operations Manual System 25020.010.B.1; *Taylor v. Astrue*, No.5:10–CV–263–FL, 2011 WL 1599679, at *11 n. 7 (E.D.N.C. Mar. 23, 2011) (noting "the severity ratings found in the 'B' criteria of the PRT form and Section 1 of the MRFC form do not equate to a mental RFC assessment"), *adopted*, 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

[3] It also appears that Ms. Moneyham references those sections of Dr. Ricketson's assessment that contain her own subjective reports of difficulties with social interactions (Tr. at 448-50). *See Morris v. Barnhart*, No. 03-1332, 2003 WL 22436040, at *4 (3d Oct. 28, 2003)("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to medical opinion.")(quoting *Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996)).

7

evaluation for children's claims (*id.* at 361-66), which differs from the adult sequential evaluation process and occurred three years before the alleged onset date.[4]

While Ms. Moneyham may disagree with the ALJ's Paragraph B findings, they are supported by Dr. Parsley's PRTF where he noted, among other things, that Ms. Moneyham has only mild restrictions in social functioning and difficulty concentrating. (Tr. at 495.) Dr. Parsley went on to explain that Ms. Moneyham's depressive symptoms would affect her ability to interact with her supervisors and peers, but she would be able to function in a limited social setting. (*Id.* at 497.) Similarly, the ALJ's findings are supported by the psychological evaluation done by state examiner, Dr. Harris-Britt, who noted that, although Ms. Moneyham "may have some difficulties interacting appropriately with peers and responding appropriately to supervision," "she was polite, cooperative, and seemed to understand and follow directions." (*Id.* at 478-80.) Dr. Harris-Britt also noted that Ms. Moneyham is able to understand and retain simple instructions and to perform simple, routine, and repetitive tasks. (Tr. at 480.) Additional support for the ALJ's Paragraph B analysis include Ms. Moneyham's report to Dr. Harris-Britt that she babysat her four-year old nephew and two-year old niece for approximately two hours each evening. (*Id.* at 477.) For these reasons, the ALJ's Paragraph B analysis is not inconsistent with the other evidence in the record and is supported by Drs. Parsley's and Harris-Britt's assessments.

---

[4] *See* 20 C.F.R. § 416.924(steps in evaluating children's disability: (1) whether child is engaging in substantial gainful activity; (2) must have severe medical impairment; (3) and whether the impairment meets, medically equals, or functionally equals listing considering the six domains 20 C.F.R. § 416.926); *Tingle ex rel. D.B. v. Colvin*, 2013 WL 5594700, at *2 (E.D.Pa. Oct. 11, 2013)(noting that the factors in determining adult disability are different form factors in determining child disability).

### c. The ALJ did not Err in Evaluating the Medical Opinions

Ms. Moneyham argues that Dr. Parsley's November, 2009 MRFC should not have been given significant weight. The ALJ gave Dr. Parsley's opinion significant weight based on the premise that Dr. Parsley reviewed Ms. Moneyham's entire medical file. (Tr. at 22.) Ms. Moneyham correctly points out that Dr. Parsley did not review her records from Duke University Medical Center.

However, the fact that a medical reviewer did not have access to all the evidence at the time of assessment is not by itself error, particularly where, as in this case, the ALJ reviewed the entire record. *See Thacker v. Astrue*, No. 3:11-CV-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011) ("The fact that the state agency physician did not have access to the entire evidentiary record-because the record was incomplete a[t] the time of the assessment-is inconsequential as the ALJ considered the entire evidentiary record and substantial evidence supports his determination."). Not only did the ALJ discuss Ms. Moneyham's records from Duke University Medical Center, we find that these records are not particularly helpful to her argument. Ms. Moneyham's Global Assessment of Functioning ("GAF") score was 50 on August 9, 2009 (Tr. at 505), but it steadily improved over several visits, ending at a 74 in November, 2010. [5] (*Id.* at 517, 519, 524, 527, 530, 533.) The ALJ noted that Ms. Moneyham

---

[5] "The GAF is a scale ranging from zero to one hundred used to rate an individual's psychological, social, and occupational functioning. Scores between 41 and 50 indicate serious symptoms (such as suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job). Scores between 51–60 indicate moderate symptoms or moderate difficulties in social, occupational, or school functioning. Scores between 61 and 70 indicate mild symptoms or some difficulty in social, occupational, or school functioning." *Breed v. Colvin*, No. 1:10-CV-583, 2013 WL 3717740, at *10 n.10 (M.D.N.C. July, 2013) (internal citations omitted)(citing Am. Psychiatric Assoc, Diagnostic and Statistical Manual of Mental Disorders 32–34 (4th Ed., Text Revision 2000)).

reported improvement in her concentration and mood and felt less sad when she took her medication and discontinued marijuana use. (*Id.* at 21, 515, 518, 523, 526, 532-33.) The ALJ also noted that Ms. Moneyham expressed interest in pursuing a job and living on her own. (*Id.* at 21, 512, 518-19.) As such, Ms. Moneyham has failed to show any harm in the ALJ's decision to assign significant weight to Dr. Parsley's assessment.[6]

Ms. Moneyham also maintains that the ALJ erred in giving significant weight to the opinions of Drs. Harris-Britt, Clougherty, and Ricketson and Ms. Mansour. The ALJ explained that he was assigning significant weight to the opinions of these providers because they examined Ms. Moneyham and had reviewed her entire medical file. (Tr. at 22.) Ms. Moneyham, once again, urges this Court to find error in the ALJ's evaluation of these opinions because none of these providers reviewed the Duke Medical Center records. Ms. Moneyham further submits that there is no evidence that Dr. Harris-Britt examined the entire file.[7]

As discussed above, the fact that these examiners did not have access to all the medical records at the time of their examinations is not by itself error. *See Thacker*, 2011 WL 7154218, at *6. The ALJ considered their evaluations. (Tr. at 17-18.) Nor is Dr. Ricketson's evaluation inconsistent with the ALJ's RFC finding because Dr. Ricketson's evaluation dealt with the

---

[6] Ms. Moneyham also suggests that Dr. Parsley did not review documents from Ms. Mansour and Dr. Solomon, among others. However, Dr. Parsley referenced her IQ scores from these examinations. (*See* 497, 355, 439.) These records also predate her alleged onset date of June 15, 2008.

[7] Ms. Moneyham's supporting brief states: "And while Dr. Britt simply stated that 'collateral records accompanied this referral' were among the sources of information for her report, there is no evidence she examined the "entire file" as claimed by the ALJ." (Doc. 9 at 11.) This allegation is merely conclusory in nature and fails to set forth any supporting facts.

10

severity of Ms. Moneyham's symptoms at steps two and three.[8] (Tr. at 448-54.) Likewise, Dr. Harris-Britt's finding that Ms. Moneyham would likely have difficulty interacting with peers is not inconsistent with the ALJ's finding that she had mild restrictions in social functioning or his RFC determination which limited her to a low social environment. Accordingly, there is no error in the weight the ALJ accorded the opinions of these providers.

D. **The ALJ's Credibility Determinations are Supported by Substantial Evidence**

Ms. Moneyham finally disputes the ALJ's evaluation of her and her mother's credibility. She maintains that the ALJ failed to articulate the reasons for his credibility findings as required under SSR 96-7p.

The Fourth Circuit outlined a two-part test for evaluating issues of credibility. *Craig*, 76 F.3d at 594-95; *see also* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" *Craig*, 76 F.3d at 594 (quoting 20 C.F.R. §§ 404.1529(b), 416.929(b)). If the first step is satisfied, as it was in this case (Tr. at 22), then step two requires the ALJ to evaluate the intensity and persistence of pain and the extent to which it affects a claimant's ability to work. *Craig*, 76 F.3d at 594. The ALJ must consider "'all the available evidence' . . . and any other

---

[8] Although Ms. Moneyham points to what she believes are several problems and inconsistencies with the ALJ's decision, this Court's review is limited to whether substantial evidence supports the ALJ's findings. This Court has already determined that the ALJ's Paragraph B findings are supported by substantial evidence. Moreover, the ALJ discussed Ms. Moneyham's functional literacy issues, in that he found her learning problems to be severe impairments, and considered these impairments when formulating the RFC. (Tr. at 18-21).

11

evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." *Id.* at 595 (internal citations omitted); *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ may not discredit a claimant solely because her subjective complaints are not substantiated by objective medical evidence. *See Craig*, 67 F.3d at 595-96. However, neither is the ALJ obligated to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *3.

In this case, the ALJ discussed Ms. Moneyham's and her mother's hearing testimony, Ms. Moneyham's medical record, her functional limitations, and symptoms. (Tr. at 16-22.) In doing so, he pointed to evidence that Ms. Moneyham could follow directions (*id.* at 18-22); she could function at a competitive level (*id.* at 18); she wanted to participate in vocational rehabilitation (*id.* at 19); she was in a six-year relationship (*id.* at 21); she babysat her niece and nephew (*id.*); and her mood and concentration improved when she took her medication (*id.*). As such, it is not the role of the reviewing court to substitute its judgment for that of the ALJ. *Johnson*, 434 F.3d at 653. It is the ALJ that has the opportunity to observe the claimant to assess her credibility. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Thus, the ALJ's credibility determination "should be accepted by the reviewing court absent 'exceptional circumstances.'" *Meadows v. Astrue*, No. 5:11-CV-00063, 2012 WL 3542536, at *9 (W.D.Va. Aug. 15, 2012)(quoting *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1010 (4th Cir. 1997)). Because there is ample evidence supporting the ALJ's credibility determinations, which are entitled to great deference, remand is not warranted.

For the reasons set forth above, the Court enters the following:

## Order

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is **AFFIRMED**; Ms. Moneyham's Motion for Judgment Reversing or Modifying the Decision of the Commissioner (Doc. 8) is DENIED; the Commissioner's Motion for Judgment on the Pleadings (Doc. 10) is **GRANTED**; and this action is **DISMISSED** with prejudice. A Judgment dismissing this action will be entered contemporaneously with this Order.

This, the 24th day of March, 2015.

                                                         /s/ Loretta C. Biggs
                                                    United States District Judge